**Donald C. HUTCHINS, Plaintiff**

v.

**CARDIAC SCIENCE, INC., et al., Defendants.**

**C.A. No. 04–30126–MAP.**

United States District Court, D. Massachusetts.

Sept. 27, 2006.

Donald C. Hutchins, Longmeadow, MA, pro se.

Colleen Moran O'Neil, Jeffrey J. Lauderdale, William E. Coughlin, Calfee, Halter & Griswold LLP, Cleveland, OH, John J. Egan, Egan, Flanagan & Cohen, PC, Springfield, MA, for Defendants.

*MEMORANDUM AND ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT AND OTHER MISCELLANEOUS RELIEF* (Dkt. Nos. 66, 67, 87, 105, 120, 127, 129, 134, 139, 141, 149, 151, 154, 163, 165, 170, 175, 187, and 198)

PONSOR, District Judge.

## I. *INTRODUCTION*

This is a suit brought by *pro se* Plaintiff Donald C. Hutchins against Cardiac Science, Inc. ("Cardiac Science") and Complient Corporation ("Complient"). Plaintiff alleges that Cardiac Science is liable for copyright and patent infringement, abuse of process, and tortious interference with contract, and that Complient is liable for fraud, fraudulent misappropriation and sale of patent, and breach of contract. Defendants deny Plaintiff's allegations and have asserted counterclaims seeking dam-

ages for breach of contract, abuse of process, tortious interference with contract, and interference with prospective advantage.

On January 4, 2006, the court heard argument on nine motions, including Complient's and Plaintiff's respective motions for summary judgment.[1] Since oral argument, Plaintiff has filed a number of additional motions, as well as an amended notice of removal of *Complient Corp. v. Donald C. Hutchins, et al.,* Hampden County Superior Court Civil Action No. 05–1115 ("the Hampden County collection action") and a second amended complaint. Complient, the plaintiff in the Hampden County collection action, opposes removal and has filed a motion to remand. Complient has also moved to strike Plaintiff's second amended complaint.

For the reasons set forth below, the court will: allow Complient's Motion for Summary Judgment (Dkt. No. 66); deny Complient's Motion for Default Judgment (Dkt. No. 67); deny Plaintiff's Motion for Summary Judgment (Dkt. No. 87); deny Plaintiff's Motion for Declaratory Judgment (Dkt. No. 105); deny, as moot, Plaintiff's Motion to Enjoin Cardiac Science to Disclose the Identity of the Current Licensee (Dkt. No. 120); deny, as moot, Plaintiff's Motion to Join Stradling, Yocca, Carlson & Rauth (Dkt. No. 127); deny Plaintiff's Motion to Join Steven Lindseth (Dkt. No. 129); deny, as moot, Plaintiff's Motion for Removal (Dkt. No. 134); deny Plaintiff's Motion to Schedule a Jury Trial (Dkt. No. 139); deny Plaintiff's Motion to Strike (Dkt. No. 141); allow Complient's Motion to Remand (Dkt. No. 149); deny Plaintiff's Second Motion for Declaratory Judgment (Dkt. No. 151); deny Plaintiff's Motion to Join CPR Limited Partnership ("CPR L.P.") (Dkt. No. 154); allow Plaintiff's Motion to Withdraw his Motion to Join Stradling, Yocca, Carlson & Rauth (Dkt. No. 163); deny Plaintiff's Motion for Sanctions against Counsel for Complient (Dkt. No. 165); deny Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 170); deny Plaintiff's Motion to join Axentis LLC ("Axentis") (Dkt. No. 175); deny Plaintiff's Motion to Define Complient (Dkt. No. 187); and allow Complient's Motion to Strike Plaintiff's Second Amended Complaint (Dkt. No. 198).

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

The court will begin by addressing Complient's Motion for Summary Judgment; the facts below therefore appear in the light most favorable to Plaintiff, the non-moving party. *See Teragram Corp. v. Marketwatch.com, Inc.,* 444 F.3d 1, 8 (1st Cir.2006) (citation omitted).[2]

---

1. On June 23, 2005, the court allowed Cardiac Science's motion for summary judgment on every claim brought against it by Plaintiff and every declaratory judgment claim brought by Cardiac Science against Plaintiff. Citing Fed.R.Civ.P. 60(b)(3), Plaintiff has filed a motion for relief from the court's refusal to reconsider this ruling. (*See* Dkt. No. 108.)

This motion will be considered in a forthcoming memorandum and order in connection with two other motions concerning Cardiac Science: Plaintiff's motion for relief from an order denying his motion for a temporary restraining order (Dkt. No. 107); and

Plaintiff's motion for sanctions against counsel for Cardiac Science (Dkt. No. 191).

2. Given Plaintiff's *pro se* status, the court, in creating this factual summary, has "attempted to parse the record and set forth the facts as favorable to [Plaintiff] as h[is] filings permit." *Swallow v. Fetzer Vineyards,* 46 Fed. Appx. 636, 639 (1st Cir.2002) (citation omitted). That being said, "conclusory allegations, improbable inferences, and unsupported speculation" have not been considered. *Galloza v. Foy,* 389 F.3d 26, 28 (1st Cir.2004) (citation omitted). In addition, uncontroverted, material facts of record set forth by Com-

On June 1, 1994, Plaintiff and his closely-held company, CPR Prompt Corporation ("CPR Prompt"), entered into a license agreement (the "License Agreement") with County Line Limited Partnership ("County Line"), a venture company under the direction of Jon and Steven Lindseth. (*See* Dkt. No. 91, Martinelli Aff.) Under the terms of this agreement, Plaintiff and his company provided County Line with an exclusive license to various intellectual properties, including CPR Prompt®—a device designed to instruct individuals in the performance of cardiopulmonary resuscitation.[3] (*See* Dkt. No. 91, Ex. E, License Agreement.)

In return, Plaintiff received an up-front payment of $100,000 and royalty payments on CPR Prompt® sales. (*Id.* at §§ 3.1–3.4.) Pursuant to § 3.10 of the License Agreement, County Line also agreed to assign its interest to an "Affiliate"[4] that would

cause each partner of such Affiliate who purchases or otherwise acquires a partnership interest of such Affiliate directly from such Affiliate to agree to pay CPR–PROMPT seven and one-half percent (7.5%) of the net proceeds of any sale of any or all of such partnership interest to any person or entity which is not an Affiliate to such partner.

(License Agreement § 3.10 (noting that "[i]f such Affiliate conducts a public offering . . ., no person or entity purchasing stock in such offering or from such Affiliate thereafter shall be required to agree to make such payments").)

On September 19, 1994, County Line assigned all of its rights and obligations under the License Agreement to CPR L.P.,[5] an Ohio entity that initially had two partners: Catalog Products, Inc. ("Catalog Products"), a 1% limited partner, and County Line itself, the 99% general partner.[6]

---

plient have been deemed admitted pursuant to Local Rule 56.1.

3. CPR Prompt® is the embodiment of U.S. Patent No. 4,583,524 ("the '524 patent"), which the U.S. Patent and Trademark Office ("PTO") issued to Plaintiff on April 22, 1986. The device is also claimed in U.S. Patent Reexamination No. 34,800 ("the '800 patent"), which the PTO issued to Plaintiff on November 29, 1994.

In addition, Plaintiff owns U.S. Patent No. 5,913,685 (filed June 24, 1996) (issued June 22, 1999) ("the '685 patent"), which discloses an electronic device "to provide guidance to rescue personnel trained in CPR for resuscitating a victim under an emergency condition." '685 patent, col.9 ll.46–48.

Plaintiff also holds one trademark registration—"CPR Prompt"—and two copyright registrations—U.S. Copyright No. TX–u–210-208, which covers the device's script and word list, and U.S. Copyright No. TX–u–213-859, which pertains to its assembler software program—that are relevant to this litigation.

4. (*See* License Agreement § 1.1 (defining "Affiliate" as "any person or entity that directly,

or indirectly through one or more intermediaries, controls, is controlled by or is under common control with first mentioned person or entity").)

5. (*See* Dkt. No. 66, Ex. C, Lindseth Aff., Ex. 1, Agreement of Limited Partnership.) Plaintiff maintains that he has never acknowledged or agreed to this assignment. (*See* Dkt. No. 84, Pl.'s Mem. Controverting Complient's Statement of Undisputed Facts 2 (noting that although the September 19, 1994 assignment included two lines for Plaintiff's signature, Plaintiff did not sign the document); *see also* Dkt. No. 40., Pl.'s Am. Compl. ¶ 30 ("Hutchins never signed or accepted the validity of the Agreement dated September 19, 1994.").)

Complient takes the position that the License Agreement did not require Plaintiff's acknowledgment or agreement.

6. In a *services agreement* dated September 19, 1994, Steven W. Lindseth signed on behalf of County Line, the general partner of CPR L.P., *and* on behalf of Catalog Products, the general partner of County Line. (Dkt. No. 66, Ex. C, Lindseth Aff., Ex. 2, Services Agreement 4.)

In December, 1997, County Line's corporate successor[7] transferred its general partnership interest in CPR L.P. to CPR Prompt LLC, which subsequently converted to Complient, a Delaware corporation. Like the previous general partners, Complient retained a 99% partnership interest in CPR L.P. and performed various services related to the License Agreement. Specifically, Complient "supplied Hutchins with sales reports, royalty payments, patent license fee payments and all other transactions covered by the License Agreement." (Dkt. No. 89, Pl.'s Statement of Undisputed Facts in Supp. Pl.'s Mot. Summ. J. ¶ 3.)

On November 23, 1999, Plaintiff attempted to terminate the License Agreement by issuing a "Notice of Termination," alleging a breach of § 3.10.[8] Five days later, on November 28, 1999, Plaintiff issued a "Final Notice of Termination" in which he claimed the same misconduct.

On December 15, 1999, Complient responded on behalf of CPR L.P. and County Line and asserted that no breach of § 3.10 had occurred.[9] Complient further advised Plaintiff that if he did not reply by December 31, 1999, Complient would consider his termination notices null. Plaintiff did not respond and later acknowledged that his efforts to terminate the License Agreement were unsuccessful.

The next significant action occurred in January of 2001, when Plaintiff, represented by counsel at the time, informed Complient of his belief that the License Agreement entitled CPR Prompt to "7.5% of the proceeds of any sale by any partner/member/shareholder of Complient ... and not simply on Complient's interest in CPR [L.P.]." (Dkt. No. 40, Ex. N, Letter from Gary E. Martinelli, counsel for Plaintiff, to Steven W. Lindseth, President, Complient at 3 (Jan. 15, 2001).) In a letter to Steven Lindseth, Plaintiff's counsel provided the following rationale for Plaintiff's position:

In the course of the drafting of the License Agreement, you informed Don Hutchins that, inasmuch as County Line had separate lines of business including Christmas tree stands and birdhouses, you intended to form a new entity to be controlled by County Line for the purposes of conducting the business to be built around the invention covered by the License Agreement. You indicated that the new entity would raise venture capital from outside investors.

Accordingly, Section 3.10 was incorporated into the License Agreement providing for the creation of an "Affiliate" and for the payment of 7.5% of the proceeds of any sale by a "partner" (intended to include County Line and any outside investors) of the Affiliate to CPR Prompt. Consistent with this, Section 4.9(d) of the License Agreement provided that the Affiliate would provide and update the names and addresses of the investor partners to CPR Prompt.... [Instead,] County Line [seems to have] proceeded with *two affiliated companies*, one to hold the rights under the License Agreement (CPR [L.P.]) and another (now Complient Corporation) to actually raise venture funding, to con-

7. The record does not indicate the name of County Line's corporate successor or when this entity assumed County Line's general partnership interest.

8. The License Agreement provides that in the event of a material breach by one party, the other party may terminate the agreement by giving ninety days written notice. (License Agreement § 8.2.)

9. Complient's response seems to have come six months before the corporation was actually created. (*See* Dkt. No. 84, Ex. 1, *Complient Corp. v. Donald C. Hutchins, et al.*, No. CV 04 540066, Compl. ¶¶ 12, 13.)

duct the business and to own CPR [L.P.]. It appears that [Complient's] thinking is that while CPR Prompt may be entitled to 7.5% of the proceeds to be derived from the sale of CPR [L.P.], CPR Prompt is not entitled to 7.5% of the proceeds to be derived from the sale of Complient. . . .

This interpretation of the License Agreement is completely at odds with the understanding of the parties at the time the License Agreement was executed. The intent was that one "Affiliate" be the holder of the License Agreement, the repository of the venture funding and the operating company.

The discussion in Section 3.10 of the consequences of a public offering or a merger would be irrelevant absent this conclusion as would be the undertaking in Section 4.9(d) to provide and update the names of other investors in the Affiliate.[10] It is also totally inconsistent with the discussions held with you leading up to the execution of the License Agreement. . . .

Finally, it is inconsistent with the early drafts of the License Agreement in which County Line itself was to be not only the licensee but also the investment vehicle. The notion of assigning the license to an affiliate was developed late in our discussions when you sought to separate bird feeder / Christmas tree

stand operations from the CPR Prompt business.

(*Id.* at 1–3 (emphasis in original).)

In conclusion, Plaintiff's counsel requested an explanation

as to how and why CPR [L.P] was relegated to a dark corner of Complient's corporate structure when the premise under which the License Agreement we entered into was that the Affiliate, i.e. CPR [L.P], would be the vehicle which would grow the CPR business and the businesses (now the businesses of Complient) that were related to it.

(*Id.* at 3.)

In February of 2001, CPR L.P. responded by filing a demand for arbitration with the American Arbitration Association ("AAA"). (Dkt. No. 84, Ex. 3, Demand for Arbitration ¶ 15; *see also id.* at ¶ 8 (citing the License Agreement's mandatory arbitration provision found in § 8.2).) That same month, Complient, in its capacity as general partner of CPR L.P., brought an action, captioned *Complient v. CPR Prompt, et al.,* No. 429394 ("*Complient I*"), against Plaintiff's company and Plaintiff in the State of Ohio, Cuyahoga County Court of Common Pleas, seeking a declaratory judgment as to the construction and effect of § 3.10. (*See* Dkt. No. 66, Ex. D, Complient's Compl. for Declaratory J. 6.)

While Plaintiff contends that "it was economically impossible for Hutchins to defend both actions,"[11] the record reflects that Plaintiff did attempt to represent CPR Prompt[12] and that he tendered an

---

10. This provision provides:

[F]or the purposes of Section 3.10, the Affiliate referred to therein shall provide CPR–PROMPT with a list of the names and addresses and resulting ownership percentage of each of the partners or shareholders of such Affiliate and shall update such list whenever such Affiliate sells or otherwise issues additional partnership or equity interests.

(License Agreement § 4.9(d).)

11. (Dkt. No. 84, Pl.'s Mem. Controverting Complient's Statement of Undisputed Facts 3.)

12. *See Hutchins v. Lindseth,* No. 01–cv–30120–KPN, slip op. at 4 n. 2 (D.Mass. Dec. 17, 2001) ("At oral argument . . ., Plaintiff explained that he appeared pro se in the Ohio action and attempted to represent [his company] as well."), *aff'd* No. 02–1212, slip op. (1st Cir. Aug. 12, 2002).

answer and asserted counterclaims and cross-claims on his own behalf in the Ohio action.[13] However, the courts of Ohio do not permit a corporation to appear *in propria persona. See Perez v. Bush,* 63 Ohio Misc.2d 423, 631 N.E.2d 192, 194 (Ohio Com.Pl.1993) (citing *Union Sav. Ass'n. v. Home Owners Aid, Inc.,* 23 Ohio St.2d 60, 262 N.E.2d 558, 560 (1970)). Consequently, on May 30, 2001, the Ohio court in *Complient I* entered the following default judgment against CPR Prompt:

> Pursuant to Section 3.10 of the License Agreement, in the event that the partners of CPR L.P., including, but not limited to ... Complient ..., sell all [o]r part of their respective partnership interest in CPR L.P. to an unrelated third party, CPR Prompt is entitled to 7.5% of the net proceeds of that sale. *Section 3.10 of the License Agreement does not entitle CPR Prompt to 7.5% of the sale of any or all assets of any other entity than CPR L.P.*

(Dkt. No. 66, Ex. F, Default J. Entry (May 30, 2001) (emphasis added).)

On September 5, 2001, the same court allowed Complient's motion for summary judgment against Plaintiff without comment. (Dkt. No. 66, Ex. F, Summ. J. Entry (Sept. 5, 2001).) [14]

In the summer of 2001, Plaintiff, *pro se,* brought a two-count action in this court against the Lindseths and five of Com-plient's institutional shareholders under the Racketeer Influenced and Corrupt Organization (RICO) Act, 18 U.S.C. §§ 1961 *et seq.* On December 17, 2001, Magistrate Judge Kenneth P. Neiman allowed the defendants' motion to dismiss, finding that Plaintiff had failed to satisfy his burden of establishing personal jurisdiction. *Hutchins v. Lindseth,* No. 01–CV–30120–KPN, slip op. at 9–10 (D.Mass. Dec. 17, 2001), *aff'd* No. 02–1212, slip op. (1st Cir. Aug. 12, 2002).

Meanwhile, unbeknownst to Plaintiff, Complient and CPR L.P. entered into an Asset Purchase Agreement ("APA") with Cardiac Science on October 21, 2003. (Dkt. No. 89, Pl.'s Statement of Undisputed Facts Supp. Pl.'s Mot. Summ. J. 3.) Under the terms of the APA, Complient, as "the sole general partner of CPR L.P." (Dkt. No. 66, Ex. C, Lindseth Aff., Ex. 3, Asset Purchase Agreement 1), caused CPR L.P. to convey to Cardiac Science all of its "assets, properties, rights, and interests," including the License Agreement (*id.* at § 1.1A). Complient also transferred to Cardiac Science "substantially all of [its] assets, properties, rights and interests," but retained its general partnership interest in CPR L.P. (*Id.* at § 1.2(i).)

In return, Complient received $47 million in Cardiac Science common stock. (Dkt. No. 40, Ex. H, Wedbush Morgan Securities Report 4, Oct. 29, 2003.) [15] Ac-

---

13. (*See* Dkt. No. 66, Ex. E, Hutchins' Answer & Countercl. & Cross-cl.)

14. Plaintiff now takes the position that he prevailed in the Demand for Arbitration. (Pl.'s Mem. Controverting Complient's Statement of Undisputed Facts 4 ("The arbitrators found CPR L.P.'s claims to be bogus and when the arbitrators pushed Complient for additional evidence, CPR L.P. withdrew from the Arbitration. The arbitrators agreed with Hutchins' reading of § 3.10.").)

This is a somewhat curious characterization of the arbitration proceedings, given that

Plaintiff sued the AAA in this court for negligence and breach of contract. *See Hutchins v. Am. Arbitration Ass'n,* No. 03–cv–30181–MAP, slip op. at 2 (D.Mass. Jan. 22, 2004) (dismissing Plaintiff's claim under the doctrine of arbitral immunity), *aff'd* 108 Fed. Appx. 647 (1st Cir.2004).

15. As will be discussed, a portion of the total amount of Cardiac Science stock was held in escrow to cover any claims for indemnification made by Cardiac Science against Complient.

cording to Plaintiff, in November of 2003, Cardiac Science began to manufacture and sell products covered by Plaintiff's patents and bearing the CPR Prompt® trademark. (Dkt. No. 40, Ex. L., Hutchins Aff. ¶ 12, July 1, 2004.)

In the spring of 2004, Plaintiff noticed that he had not received any royalty payments or reports from Complient since the previous summer. (*Id.* at ¶ 8.)[16] When Plaintiff called Complient's Cleveland headquarters he discovered that CPR L.P.'s general partner was no longer in business. (*Id.*)

Plaintiff subsequently contacted the law firm of Fish & Richardson and learned that Complient, for the first time since 1995, had recently failed to pay certain fees related to Plaintiff's patents. Under the circumstances, Plaintiff concluded that Complient had abandoned his intellectual properties, and he began discussing the possibility of licensing these properties to another entity. (*Id.* at ¶ 9.)[17]

On April 29, 2004, Plaintiff received a phone call from a representative of Cardiac Science, who informed Plaintiff that Cardiac Science had acquired his intellectual properties. (*Id.* at ¶ 11.) After familiarizing himself with the terms of the APA, Plaintiff concluded that the 7.5% exit payment described in § 3.10 of the License Agreement had been triggered. On July 2, 2004, in response to Cardiac Science's refusal to recognize his right to an equity interest of $3,525,000, Plaintiff filed his original complaint in this action, alleging copyright and patent infringement, negli-

gence, and breach of contract on the part of Cardiac Science.

On July 28, 2004, Cardiac Science issued a demand for indemnity to Complient based upon Plaintiff's complaint. Complient responded by bringing a second action against Plaintiff and his company in the Cuyahoga County Court of Common Pleas, captioned *Complient v. Hutchins, et al.*, No. 540066 ("*Complient II*"), asserting claims for tortious interference with contract and abuse of process. In its *Complient II* complaint, Complient also sought a declaratory judgment regarding the construction and effect of § 3.10 of the License Agreement and § 1.2(i) of the APA.

According to Plaintiff, Steven Lindseth and his attorneys

> recognized that it would be difficult and cost prohibitive for [Plaintiff] to conduct a defense from 800 miles away. Recognizing that [Plaintiff] could not afford representation, they presumed that CPR Prompt would lose by default and that they could use *res judicata* for leverage against [Plaintiff's] *pro se* personal defense.

(Dkt. No. 90, Hutchins Aff. ¶ 11, Sept. 6, 2005.)

On September 3, 2004, the day after Complient served Plaintiff with the *Complient II* complaint, Plaintiff filed a motion to join Complient in this action. During a hearing six days later, this court denied Plaintiff's motion for failure to comply with Local Rule 15.1.[18] Plaintiff subsequently

---

**16.** This assertion seems somewhat inconsistent with the copy of a check from Complient to Plaintiff's company dated December 4, 2003, which Plaintiff attached as an exhibit to his amended complaint. (*See* Dkt. No. 40, Ex. K, Check No. 053045.)

**17.** When these discussions broke down, Plaintiff sued that entity in this court alleging claims for breach of contract, patent and

copyright infringement. *See Hutchins v. Zoll Med. Corp.,* 430 F.Supp.2d 24 (D.Mass.2006) (allowing defendant's motion for summary judgment).

**18.** The court also heard argument on three other motions, including Cardiac Science's motion to dismiss, which the court allowed with respect to Plaintiff's negligence claims, but otherwise denied.

filed an amended motion to join Complient, which the court allowed on November 18, 2004.

Pursuant to that ruling, Plaintiff filed an eight-count amended complaint on December 22, 2004, asserting claims of fraud (Count IV), fraudulent misappropriation and sale of patent (Count VI), and breach of contract (Count VIII) against Complient, and claims of copyright infringement (Count I), patent infringement by means of sales (Count II), patent infringement by means of manufacture (Count III), abuse of process (Count VI), and tortious interference with contract (Count VII) against Cardiac Science.

On January 26, 2005, the Ohio court in *Complient II* entered a default judgment against CPR Prompt, finding

(a) that CPR Prompt ha [d] not effectively terminated the License Agreement . . .;

(b) that the partnerships interests in CPR L.P. were not sold to Cardiac Science . . . pursuant to the [APA] . . .; and

(c) that the 7.5% payment provision of Section 3.10 of the License Agreement was not triggered by virtue of the [APA].

(Dkt. No. 66, Ex. H, Default J. Entry (Jan. 26, 2005).)

On May 16, 2005, Complient filed its answer to Plaintiff's amended complaint and brought counterclaims against Plaintiff for tortious interference with the APA (Count I) and abuse of process (Count II). Because these counterclaims were identical to "claims" Complient brought in the *Com-*

*plient II* action, Plaintiff did not offer a timely response.

On July 29, 2005, Complient filed a motion for summary judgment on the claims brought against it by Plaintiff and a motion for default judgment on its counterclaims against Plaintiff. Plaintiff filed an answer to Complient's counterclaims on August 22, 2005 and a memorandum opposing Complient's motion for default judgment the following day.

On August 24, 2005, Plaintiff offered his opposition to Complient's motion for summary judgment. That same day, the *Complient II* court granted Complient's motion for summary judgment against Plaintiff "on the grounds of res judicata and the License Agreement and the [APA]." (Dkt. No. 98, Ex. A., Summ. J. Entry (Aug. 24, 2005).) [19]

### III. *CROSS MOTIONS FOR SUMMARY JUDGMENT*

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Johnson v. Gordon*, 409 F.3d 12, 16–17 (1st Cir.2005) (citation omitted). Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In cases where both parties have moved for summary judgment, the basic summary judgment framework remains intact. *De Jesus–Rentas v. Baxter Pharm. Servs. Corp.*, 400 F.3d 72, 74 (1st Cir.2005) (citation omitted). "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment

**19.** On September 29, 2005, the Ohio court in *Complient II* entered judgment against Plaintiff and his company, jointly and severally, in the amount of $278,384.00. (Dkt. No. 207, Ex. A, Final J. (Sept. 29, 2005).) On July 19, 2006, the same court also awarded attorney fees and costs to Complient in the amount of $95,662.82. (Dkt. No. 207, Ex. B, J. Entry (July 19, 2006).)

may be entered in accordance with the Rule 56 standard." *Bienkowski v. Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir. 2002) (citation omitted).

While the court must alternately draw all reasonable inferences in each nonmovant's favor, each nonmovant "must respond to a properly supported motion with sufficient evidence to allow a reasonable jury to find in its favor 'with respect to each issue on which [it] has the burden of proof.'" *Prado Alvarez v. R.J. Reynolds Tobacco Co., Inc.*, 405 F.3d 36, 39 (1st Cir.2005) (citing *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997)). Ultimately, an alleged factual dispute must be capable of affecting the suit's outcome to withstand an otherwise properly supported motion for summary judgment. *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

A. *Complient's Motion for Summary Judgment (Dkt. No. 66).*

 1. *Count IV: Fraud.*

▉ Under Massachusetts law, a plaintiff alleging fraud must show: (1) that the defendant knowingly made at least one false statement; (2) that the statement was made with the intent to deceive; (3) that the statement was material to the plaintiff's decision to enter into an agreement; (4) that the plaintiff reasonably relied on the statement; and (5) Plaintiff's reliance was the proximate cause of his injury. *Zyla v. Wadsworth, Div. of Thomson Corp.*, 360 F.3d 243, 254 (1st Cir.2004) (applying Massachusetts law) (citations omitted).

In an effort to make this showing, Plaintiff claims that Complient: knowingly misled Cardiac Science as to the proper construction of the License Agreement; failed to provide Plaintiff with notice regarding the APA; neglected to seek Plaintiff's permission to transfer his intellectual properties; and falsely represented to Cardiac Science that such properties were under CPR L.P.'s control. (Dkt. No. 40, Am. Compl.¶¶ 56–59.)

▉ Unfortunately for Plaintiff, none of these acts can support a claim for fraud since none of Complient's allegedly false statements were directed to him. *Cf. Movitz v. Home Depot U.S.A., Inc.*, 82 Fed.Appx. 230, 231 (1st Cir.2003) (applying New Hampshire law) (noting plaintiff's failure to assert that defendant "misrepresented any facts to him"). Moreover, Plaintiff does not allege, as he must, that he relied on any of Complient's purported misrepresentations. *Rogers v. Nstar Elec.*, 389 F.Supp.2d 100, 108 (D.Mass. 2005) ("The common law claim for fraud . . . requires that the plaintiff show that he relied to his detriment on a false representation of a material fact by the defendants.") (emphasis in original).

In short, because the alleged misrepresentations were made to Cardiac Science rather than Plaintiff, Count IV fails as a matter of law, and Complient is entitled to summary judgment.

 2. *Count V: Fraudulent Misappropriation and Sale of Patent.*

In support of his contention that Complient is liable for its fraudulent misappropriation and sale of the '685 patent, Plaintiff asserts that Complient "deceived Cardiac Science to believe that Cardiac Science purchased [the '685 patent] as part of the [APA]." (Am.Compl.¶ 62.) As previously noted, to set forth a viable claim for fraud, a plaintiff must point to misrepresentations made to him. In light of Plaintiff's failure to do so, Count V cannot survive Complient's motion for summary judgment.

### 3. *Count VIII: Breach of Contract.*

Plaintiff contends that Complient breached the License Agreement by: (1) failing to provide written notice regarding certain business decisions; (2) neglecting to make royalty payments, send quarterly reports, or pay patent fees; and (3) refusing to transfer 7.5% of the proceeds it received from Cardiac Science pursuant to the APA. (Am.Compl.¶¶ 85–93.) In accordance with the choice-of-law provision in the License Agreement, these allegations will be analyzed under the laws of Ohio. (*See* License Agreement § 9.6.)

#### *Failure to Notify.*

According to Plaintiff, Complient was obligated to provide him with written notice regarding the transfer of his intellectual properties, the closure of its Cleveland office, and the decision to stop selling CPR Prompt® products. Unfortunately for Plaintiff, no such duties appear in the License Agreement,[20] and courts cannot "read[ ] terms into instruments when these terms do not otherwise exist." *Mark–It Place Foods, Inc. v. New Plan Excel Realty Trust, Inc.*, 156 Ohio App.3d 65, 804 N.E.2d 979, 993 (2004) (citation omitted); *see also Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 46 Ohio St.3d 51, 544 N.E.2d 920, 923 (1989) ("Intentions not expressed in the writing are deemed to have no existence . . . ." (citation omitted)); *Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.*, 156 Ohio App.3d 575, 807 N.E.2d 953, 962 (2004) ("[A party] simply cannot be liable for failing to perform in good faith and fair dealing an obligation that was not imposed upon it by the [contract]."). Consequently, Complient's motion for summary judgment with respect to Plaintiff's failure to notify allegations must be allowed.

#### *Royalty Payments, Quarterly Reports, and Patent Fees.*

Under the terms of the License Agreement, the Licensee must: make "minimum royalty payments" on an annual basis (License Agreement § 3.4); issue quarterly reports setting forth specific sales information (*id.* at § 3.5); and pay for "all acts reasonably necessary to maintain, sustain, reexamine, reissue, or extend the Licensed Patents" (*id.* at § 4.4). Plaintiff asserts that since September of 2003, Complient has not fulfilled these obligations.

■ This claim suffers from the undisputed fact that Complient's obligations under the License Agreement ceased with the execution of the APA on October 21, 2003. (*See* Dkt. No. 88, Pl.'s Mem. Support Pl.'s Mot. Summ. J. 3 ("Th[e] APA effectively transferred the Complient Corporation's interest . . . in the June 1, 1994 License Agreement . . . to Cardiac Science, Inc.")) While the record suggests that certain patent annuity payments were not paid in November, 2004 (*see* Dkt. No. 97, Ex. 6, Letter from Gail Brumble, Annuity Coordinator, Fish & Richardson, to Donald C. Hutchins (Feb. 8, 2005)), there is no indication that *Complient* failed to make royalty payments, issue quarterly reports, or pay patent fees on a timely basis.[21] Ultimately, because no reasonable juror could find that *Complient* breached any of these duties, summary judgment is appropriate with respect to this allegation.

---

**20.** The only provisions of the License Agreement that address the question of notice involve the Licensee's right to grant sublicenses and each party's right to terminate the agreement. (*See* License Agreement §§ 2.1, 8.2.)

**21.** (*See* Dkt. No. 60, Ex. 1, Hutchins Aff. ¶ 16, June 24, 2005 (acknowledging that Cardiac Science made a royalty payment on behalf of Complient for sales in the third quarter of 2003 pursuant to § 2.1(c) of the APA).)

### The 7.5% Payment Provision.

The gravamen of Plaintiff's breach of contract claim is that Complient impermissibly withheld 7.5% of the stock it received from Cardiac Science in exchange for Plaintiff's intellectual properties. According to Plaintiff, the APA

> triggered the terms of Section 3.10[, which] ... clearly require that the stockholders of the Complient Corporation pay the LICENSOR, namely Hutchins, seven and one-half percent (7–1/2) of the net proceeds of any sale to a non-affiliated entity.

(Hutchins Aff. ¶ 3, Sept. 6, 2001.)

Complient contends that two courts of competent jurisdiction have already entered judgments that preclude such an argument. It cites the conclusion of *Complient I*, prior to the APA, that the 7.5% payment provision could only be triggered by Complient's sale of its partnership interest in CPR L.P., and the *Complient II* court's determination that because Complient did not sell its partnership interest in CPR L.P., the 7.5% payment provision was not triggered.

Plaintiff retorts that Complient's invocation of *res judicata* is unwarranted in light of its failure to meet its burden of establishing that the issues in question were actually litigated or that the parties to the litigation were in privity. While Plaintiff's argument may ultimately prove persuasive to the Supreme Court of Ohio, it cannot forestall summary judgment here.

▮ The full faith and credit statute, 28 U.S.C. § 1738, requires a federal court to give state-court judgments the same preclusive effect they would be given under the law of the state in which the judgments were entered. *Torromeo v. Town of Fremont, N.H.*, 438 F.3d 113, 115–16 (1st Cir.2006), (citing *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)), *cert. denied*, —— U.S. ——, 127 S.Ct. 257, 166 L.Ed.2d 150, 75 U.S.L.W. 3036 (2006). In this case, the state-court judgments in question were entered by Ohio courts; thus the law of Ohio determines the extent of their preclusive effect.

▮ In *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 653 N.E.2d 226 (1995), the Supreme Court of Ohio explained that the doctrine of *res judicata* encompasses "both claim preclusion (historically called estoppel by judgment in Ohio) and issue preclusion (traditionally known as collateral estoppel)." *Id.* at 228 (citations omitted). In order for issue preclusion to apply, the party asserting it "must show that the parties in the prior action were identical to, or at least in privity with, the parties in the new action, and that the issue in question was actually litigated and necessarily decided in the earlier action." *Kalia v. Kalia*, 151 Ohio App.3d 145, 783 N.E.2d 623, 630 (2002) (citing *Ft. Frye Teachers Ass'n., OEA/NEA v. State Employment Relations Bd.*, 81 Ohio St.3d 392, 692 N.E.2d 140, 144 (1998)), *appeal denied*, 98 Ohio St.3d 1566, 787 N.E.2d 1231 (2003).[22]

---

**22.** A litigant invoking claim preclusion must establish:

> (1) a prior final, valid decision on the merits by a court of competent jurisdiction; (2) a second action involving the same parties, or their privies, as the first; (3) a second action raising claims that were or could have been litigated in the first action; and (4) a second action arising out of the trans-

action or occurrence that was the subject matter of the previous action.
*Hapgood v. City of Warren*, 127 F.3d 490, 493 (6th Cir.1997), *cert. denied*, 523 U.S. 1046, 118 S.Ct. 1361, 140 L.Ed.2d 511 (1998), *cited with approval in Portage Cty. Bd. of Commrs. v. Akron*, 109 Ohio St.3d 106, 846 N.E.2d 478, 495 (2006).

In light of its conclusion that Plaintiff is collaterally estopped from contesting the con-

■ If the default judgments against CPR Prompt were the only judgments at issue, Plaintiff's claim that the construction of § 3.10 of the License Agreement was not "actually litigated" would be quite formidable. While Ohio's intermediate courts have applied the doctrine of collateral estoppel to default judgments inconsistently, *compare N. Dayton Truck Serv. v. Terrell*, No. 7447, 1982 WL 3691, at \*2 (Ohio App. 2 Dist. Mar.15, 1982) (concluding that default judgment had no preclusive effect because "no issue was actually and necessarily litigated"), *with Corydon Palmer Dental Soc. v. Johnson, Johnson & Assocs., Inc.*, No. 87 C.A. 121, 1988 WL 21334, at \*2 (Ohio App. 7 Dist. Feb.16, 1988) (noting that issue preclusion "has been applied to judgments by default" (citations omitted)), persuasive authority suggests that the preclusive effect of default judgments should be confined to cases in which (1) the plaintiff presented "admissible evidence apart from his pleadings," (2) the state court actually made "findings of fact and conclusions of law . . . sufficiently detailed to support the application of the collateral estoppel doctrine in the subsequent proceeding," and (3) "the circumstances . . . would make it equitable to do so," *In re Robinson*, 242 B.R. 380, 387 (Bkrtcy.N.D.Ohio 1999) (finding that the unsettled state of the law compelled the court to "use its best judgment in anticipating how the Supreme Court of Ohio would rule if confronted with the issue"); *see also In re Sweeney*, 276 B.R. 186, 193, 194 (6th Cir.BAP2002) (adopting the *Robinson* test after determining that intermediate Ohio courts only give default judgments preclusive effect if they contain "express findings").

In rendering default judgments against CPR Prompt, it seems clear that what *Complient I* and *Complient II* found would be insufficient to support the application of the collateral estoppel doctrine in a subsequent proceeding *against Plaintiff's corporation, CPR Prompt.*[23]

Likewise, if the onus was on Complient to establish privity between Plaintiff and CPR Prompt, it seems unlikely it could do so. Although Ohio courts frequently have found privity between individuals and their closely-held corporations, *see, e.g., Keeley & Assoc., Inc. v. Integrity Supply, Inc.*, 120 Ohio App.3d 1, 696 N.E.2d 618, 621 (1997) (finding that the plaintiff corporation and its sole shareholder and director "shared a common identity for purposes of the transaction underlying this litigation"), "[t]he question of privity centers on whether the new party had adequate representation in the prior action," *Grant Fritzsche Ent., Inc. v. Fritzsche*, 107 Ohio App.3d 23, 667 N.E.2d 1004, 1006 (1995).[24] In each

---

struction of § 3.10, the court need not discuss whether estoppel by judgment applies as well.

**23.** Indeed, each court seems to have found nothing more than a perfection of service against CPR Prompt and CPR Prompt's failure to respond within the time prescribed by the Ohio Rules of Civil Procedure. (*See* Dkt. No. 66, Ex. F, Default J. Entry (May 30, 2001); Dkt. No. 66, Ex. H., Default J. Entry (Jan. 26, 2005).)

**24.** While *Leonard v. Bank One Youngstown, Ohio*, No. 96–C.A.–42, 1997 WL 816538 (Ohio App. 7 Dist. Dec.24, 1997), *appeal denied*, 81 Ohio St.3d 1516, 692 N.E.2d 620 (1998), does state that privity can be established if the sole shareholder "controlled the earlier action," *id.* at \*4 (citing *Latham v. Wells Fargo Bank, N.A.*, 896 F.2d 979 (5th Cir.1990)), the Fifth Circuit case *Leonard* relies upon for that proposition makes it clear that "for res judicata purposes, . . . the non-party's control must be such as to place his interests before the court," *Latham*, 896 F.2d at 983 ("Adequate representation must do the same thing; if it does not, there can be no bar, even for entities as closely aligned as [the plaintiff] and the corporations are here.").

Cuyahoga County action against CPR Prompt, neither Plaintiff nor his company had *any* representation.

■ Based on the foregoing, the problem, from Plaintiff's perspective, is not the default judgments entered against his company, but rather the summary judgments entered against him personally. While the law of Ohio may be somewhat unsettled as to the preclusive effect of a default judgment on subsequent litigation between the parties, there is no doubt that an action that concludes with summary judgment has been "actually litigated" for purposes of collateral estoppel. *See A–1 Nursing Care of Cleveland, Inc. v. Florence Nightingale Nursing, Inc.,* 97 Ohio App.3d 623, 647 N.E.2d 222, 224 (1994); *accord Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.,* 421 F.2d 1313, 1319 (5th Cir.1970), *cert. denied,* 400 U.S. 991, 91 S.Ct. 454, 27 L.Ed.2d 439 (1971) ("It would be strange indeed if a summary judgment could not have collateral estoppel effect. This would reduce the utility of this modern device to zero.... Indeed, a more positive adjudication is hard to imagine.").

■ The court need not give credence to Plaintiff's characterization of the Cuyahoga County proceedings as "biased" or "chaotic" to be somewhat disturbed by this result. Plaintiff's "choice" to represent himself and his closely-held company in Ohio appears to have greatly reduced any chance to prevail on his view of the proper construction of the License Agreement.[25] Given his appearance, however, the summary judgment entries by Ohio courts against Plaintiff constitute adjudications on the merits with full preclusive effect.

This is not to say that had Plaintiff been afforded such an opportunity he would have emerged victorious. Indeed, putting aside the issue of *res judicata,* it is worth noting that Plaintiff's construction of § 3.10 appears untenable.

As previously noted, Plaintiff takes the position that § 3.10 of the License Agreement was triggered when Complient and CPR L.P. sold their respective interests in the License Agreement to Cardiac Science. Complient claims that the execution of the APA did not implicate the 7.5% payment provision found in § 3.10 due to the fact that Complient retained its interest in CPR L.P.

■ "The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin County,* 78 Ohio St.3d 353, 678 N.E.2d 519, 526 (1997) (citation omitted). To ascertain the intent of parties to a written contract, a court must look first to "the language of the instrument itself, and there can be no implication inconsistent with the express terms thereof." *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.,* 86 Ohio St.3d 270, 714 N.E.2d 898, 901 (1999), *reconsideration denied by* 87 Ohio St.3d 1421, 717 N.E.2d 1107 (1999). While effect should be given to all of a written instrument's words "if this can be done by any reasonable interpretation," *Mapletown Foods, Inc. v. Motorists Mut. Ins. Co.,* 104 Ohio App.3d 345, 662 N.E.2d 48, 49 (1995), "a contract provision is not to be wholly dis-

**25.** As one commentator points out, there is a "growing realization that those who appear in court without lawyers are, as a general matter, only 'choosing' to do so in the most formal sense." Rather, that "choice" is a product of their economic situation and the cost of counsel. Richard Zorza, *The Disconnect between the Requirements of Judicial Neutrality and those of the Appearance of Neutrality when Parties Appear Pro Se: Causes, Solutions, Recommendations, and Implications,* 17 Geo. J. Legal Ethics 423, 425 (2004).

regarded because it is inconsistent with other provisions, unless no other reasonable construction is possible," *Eagle v. Fred Martin Motor Co.*, 157 Ohio App.3d 150, 809 N.E.2d 1161, 1173 (2004).

Plaintiff contends that the intent of the parties to the License Agreement can best be gleaned by examining earlier drafts of the document, which, he claims, show that the assignment of the license to an affiliate was intended solely to accommodate County Line's desire to separate its new CPR Prompt business from its existing bird feeder and Christmas tree stand operations. According to Plaintiff, these earlier drafts make it clear that the goal of the License Agreement was to give Plaintiff an equity interest in the "investment vehicle," which turned out to be Complient.

 Unfortunately for Plaintiff, under the principle of contract integration, "where the parties' intent is sought to be ascertained from several writings, a prior writing will be rejected in favor of a subsequent one if the latter writing contains the whole of the parties' agreement." *TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 70 Ohio St.3d 271, 638 N.E.2d 572, 575 (1994), *order clarified by* 71 Ohio St.3d 1202, 640 N.E.2d 1144 (1994); *see also Rhodes v. Rhodes Indus., Inc.*, 71 Ohio App.3d 797, 595 N.E.2d 441, 446 (1991) (citing the "salutary effects of barring evidence of prior negotiations which vary or contradict the express language of a written agreement"). In this case, the License Agreement contains an integration clause, which in clear and unambiguous terms provides:

> This Agreement supercedes all prior negotiations, agreements and understandings between LICENSOR and LICENSEE and constitutes the entire agreement between LICENSOR and LICENSEE as to the subject matter hereof.

(License Agreement § 9.8.) Consequently, the earlier drafts of the License Agreement cannot be considered in attempting to ascertain the parties' intent.

Plaintiff next argues against adopting Complient's interpretation of § 3.10 on the ground that doing so would deprive § 4.9(d) of any meaning. As previously noted, § 4.9(d) requires the Affiliate to keep Plaintiff abreast of the names and ownership percentages of its investors. While this provision does seem to suggest that the parties anticipated some future change in the Affiliate's owners, neither § 4.9(d) nor any other provision of the License Agreement required County Line (or its progeny) to sell its interest in the Affiliate. Accordingly, the court cannot say that the plain language of § 3.10, which only imposes upon Affiliate partners an obligation to pay Plaintiff a percentage of the net proceeds from the sale of a "partnership interest," renders § 4.9(d) meaningless.

Plaintiff's final argument, the one he has fixated upon throughout this litigation, seems to stem from his belief that an inventor should profit from the sale of his intellectual property. As a general proposition, this seems beyond dispute. However, when that inventor agrees to sell his intellectual property, a court cannot construct the contract that effectuates the sale on the basis of what it believes would be fairest or most advantageous to the inventor. As the Supreme Court of Ohio recently reiterated:

> Cases of contractual interpretation should not be decided on the basis of what is "just" or equitable. This concept is applicable even where a party has made a bad bargain, contracted away all his rights, and has been left in the position of doing the work while another may benefit from the work. Where various written documents exist,

it is the court's duty to interpret their meaning, and reach a decision by using the usual tools of contractual interpretation (e.g., the written documents, the intent of the parties, and the acts of the parties) and not by a determination of what is fair, equitable, or just.

*N. Buckeye Educ. Council Group Health Benefits Plan v. Lawson,* 103 Ohio St.3d 188, 814 N.E.2d 1210, 1216 (2004) (quoting *Ervin v. Garner,* 25 Ohio St.2d 231, 267 N.E.2d 769, 774 (1971)), *reconsideration denied by* 104 Ohio St.3d 1411, 818 N.E.2d 712 (2004); *see also Foster Wheeler Enviresponse,* 678 N.E.2d at 526 ("A contract 'does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto.' " (citations omitted)); *Cline v. Rose,* 96 Ohio App.3d 611, 645 N.E.2d 806, 809 n. 2 (1994) ("Courts are not authorized to make for parties contracts which they did not make for themselves." (citation omitted)).

██ In sum, the court finds that even if Plaintiff's proffered construction of § 3.10 of the License Agreement was not barred by the doctrine of collateral estoppel, summary judgment on Count Eight of his amended complaint would still be required. Thus Defendant is entitled to judgment both substantively and by operation of the Ohio decisions.

B. *Plaintiff's Motion for Summary Judgment (Dkt. No. 87).*

██ In moving for summary judgment against Complient, Plaintiff asserts that Complient is liable for tortious interference with contract based upon its decision to sue him and his company a second time in the Cuyahoga County Court of Common Pleas. In order to establish the elements of a tortious interference claim, a litigant must prove that: "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Draghetti v. Chmielewski,* 416 Mass. 808, 626 N.E.2d 862, 868 (1994) (citations omitted).

In this case, Plaintiff has not alleged that Complient knowingly induced Cardiac Science to break its contract with Plaintiff. In fact, Count VII does not allege any wrongdoing on the part of Complient, but focuses exclusively on misconduct allegedly perpetrated by Cardiac Science. Accordingly, Plaintiff's request for summary judgment with respect to Count VII must be denied.

In light of its decision to allow Complient's motion for summary judgment as to Counts Four, Five, and Eight, the court will naturally deny Plaintiff's motion with respect to these counts as well.

IV. *MOTIONS FOR OTHER MISCELLANEOUS RELIEF*

A. *Complient's Motion for Default Judgment (Dkt. No. 67).*

In support of this motion, Complient asserts that Plaintiff is liable for: (1) tortious interference with contract based on his decision to sue Cardiac Science despite the fact that he knew such a suit could prevent or at least delay a payment due Complient under the APA; and (2) abuse of process for filing baseless fraud-related claims against Complient, as well as a breach of contract claim barred by the doctrine of *res judicata.* Because Plaintiff failed to file a timely response to these claims, Complient submits that it is entitled to a default judgment against Plaintiff on its two-count counterclaim pursuant to Fed.R.Civ.P. 55(b)(2).

The considerations governing entry of judgment by default have been usefully summarized.

> When an application is made to the court under Rule 55(b)(2) for the entry of a judgment by default, the district judge is required to exercise sound judicial discretion in determining whether the judgment should be entered.... This element of discretion makes it clear that the party making the request is not entitled to a default judgment as of right, even when defendant is technically in default.... In determining whether to enter a default judgment, the court is free to consider a number of factors that may appear from the record before it. Among these are the amount of money potentially involved; [and] ... whether plaintiff has been substantially prejudiced by the delay involved.... Furthermore, the court may consider how harsh an effect a default judgment might have; or whether the default was caused by a good-faith mistake....

10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2685.

 Complient's motion for a default judgment will be denied for the following reasons. First, the amount of money at stake is significant: $252,542. Second, Plaintiff appears to have made a good faith mistake in thinking he did not have to respond to these allegations since they had already been asserted by Complient in another judicial proceeding. Finally, this ruling will cause Complient no prejudice as it has already been awarded damages and attorneys' fees in excess of $370,000 on identical claims in the *Complient II* action. *See Four Corners Serv. Station, Inc. v. Mobil Oil Corp.*, 51 F.3d 306, 313 (1st Cir.1995) (noting that while a party injured by a tortious act is entitled to compensatory damages, these damages "may not ex-

ceed the amount necessary to make the injured party *whole*" (citations omitted) (emphasis in original)); *see also Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1459 (10th Cir.1997) ("If a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery." (citation omitted)).

**B.** *Plaintiff's Motion for Declaratory Judgment (Dkt. No. 105).*

Plaintiff seeks a declaratory judgment stating that Complient has not met its burden of establishing that any material issue in this case was previously raised and decided in *Complient II*. Because the judgment against Plaintiff in *Complient II* came at the summary judgment stage, this motion must be denied.

**C.** *Plaintiff's Motion to Enjoin Cardiac Science to Disclose the Identity of the Current Licensee (Dkt. No. 120).*

In light of recent revelations regarding Cardiac Science's sale of Plaintiff's intellectual property to Aristotle Corporation in August of 2004 (*see* Dkt. No. 210, Skaar Decl. ¶ 3), this motion is now moot.

**D.** *Plaintiff's Motion to Join Stradling, Yocca, Carlson & Rauth (Dkt. No. 127).*

This motion will be denied as moot. *See infra* Section IV.L.

**E.** *Plaintiff's Motion to Join Steven Lindseth (Dkt. No. 129.)*

Plaintiff contends that Steven Lindseth must be joined as a defendant to this action because Complient no longer exists and cannot pay damages. In addition, Plaintiff argues that Lindseth's presence in this suit is necessary to keep Plaintiff and Cardiac Science from incurring "inconsistent obligations."

The joinder of parties is governed by Rule 19 of the Federal Rules of Civil Procedure, which seeks to "further[ ] several related policies, including the public interest in preventing multiple and repetitive litigation, the interest of the present parties in obtaining complete and effective relief in a single action, and the interest of absentees in avoiding the possible prejudicial effect of deciding the case without them." *Z & B Enters. v. Tastee–Freez Int'l, Inc.,* 162 Fed.Appx. 16, 18 (1st Cir. 2006) (citation omitted). In making a Rule 19 determination, the court must first consider "whether a person fits the definition of those who should 'be joined if feasible' under Rule 19(a). That is to say, is the person (what used to be called) a 'necessary' party?" *Pujol v. Shearson/Am. Express,* 877 F.2d 132, 134 (1st Cir.1989) (Breyer, J.) (citation omitted).[26]

Pursuant to Rule 19(a), a party should be joined, when feasible,

> if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a). In applying Rule 19(a), a court must "decide whether considerations of efficiency and fairness, growing out of the particular circumstances of the case, require that a particular person be joined as a party." *Pujol,* 877 F.2d at 134.

---

**26.** If the person is not a necessary party under the court need not determine whether he is what called an "indispensable" party under

Plaintiff asserts that both he "and Cardiac Science meet the test that in [the] absence of Steven Lindseth relief cannot be accorded among the parties." (Dkt. No. 130, Pl.'s Am. Mem. Supp. Mot. Joinder 3 (citing Fed.R.Civ.P. 19(a)(1).)) Since Cardiac Science did not assert any cross-claims against Complient, there is no danger that Steven Lindseth's absence from this action will prejudice Cardiac Science in any way. Likewise, because the court will allow Complient's Motion for Summary Judgment, Steven Lindseth's presence will not be necessary to ensure that Plaintiff is not injured by Complient's alleged insolvency.

Plaintiff's invocation of Rule 19(a)(2)(ii) is equally unavailing. In order to persuade a court to allow joinder under this provision, a party must demonstrate that "the possibility of being subject to multiple obligations is real; an unsubstantiated or speculative risk will not satisfy the Rule 19(a) criteria." *Gen. Council of Assemblies of God v. Fraternidad de Iglesia de Asamblea de Dios Autonoma Hispana, Inc.,* 382 F.Supp.2d 315, 320 (D.P.R.2005) (quoting 7 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1604). In this case, Plaintiff has not identified what "inconsistent obligations" he might incur should Steven Lindseth not be made a party to this case. The risk envisioned by Plaintiff is therefore speculative rather than substantial, and his motion to join Steven Lindseth will be denied.

F. *Plaintiff's Motion for Removal (Dkt. No. 134).*

In light of Plaintiff's filing of an amended notice of removal (*see* Dkt. No. 137), this motion will be denied as moot.

---

Rule 19(b). *See Delgado v. Plaza Las Americas, Inc.,* 139 F.3d 1, 3 n. 2 (1st Cir.1998).

### G. *Plaintiff's Motion to Schedule a Jury Trial (Dkt.139).*

Having decided to allow Complient's Motion for Summary Judgment, the court will deny Plaintiff's request to schedule a jury trial on Count Eight of his amended complaint.

### H. *Plaintiff's Motion to Strike (Dkt. No. 141).*

In this motion, Plaintiff appears to be asking the court to strike certain statements made by Complient's counsel during the most recent oral argument based upon counsel's failure to make certain disclosures. This motion will be denied. Plaintiff has not specified which statements should be stricken. Moreover, the statements made by counsel on January 4, 2006 have not affected the court's resolution of the matters before it.

### I. *Complient's Motion to Remand (Dkt. No. 149).*

Complient filed the Hampden County collection action in November, 2005 to enforce the judgments it obtained against Plaintiff and his company in *Complient II.* On December 23, 2005, Plaintiff filed a "motion for removal," and on January 5, 2006, he filed an amended notice of removal. (*See* Dkt. No. 137.)

Under 28 U.S.C. § 1441, a defendant may remove a state court action to federal court when the complaint is based on a federal question or diversity of citizenship. 28 U.S.C. § 1441(b). In this case, Plaintiff makes no effort to frame the Hampden County collection action as one involving a federal question. Accordingly, the only question is whether the action may be removed based upon the fact that Plaintiff and CPR Prompt are citizens of Massachusetts, and Complient is a citizen of Ohio.

 Unfortunately for Plaintiff, § 1441(b) limits the right of removal to cases in which "none of the parties in interest properly joined and served *as defendants* is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b) (emphasis added). In other words, § 1441(b) does not permit Massachusetts defendants to remove an action to federal court on the basis of diversity when they have been sued by an Ohio corporation in a Massachusetts state court. *See Barbara Brawn, Ameriklean, Inc. v. Donald Coleman, SEIU,* 167 F.Supp.2d 145, 148 n. 4 (D.Mass.2001) ("Although the case initially could have been brought [by South Carolina plaintiffs] in federal court as a diversity matter, ... the Defendants cannot remove the action [from a Massachusetts Superior court] on that basis because the Defendants both reside in Massachusetts."); *see also Farm Constr. Servs., Inc. v. Fudge,* 831 F.2d 18, 21–22 (1st Cir.1987).

Because Plaintiff has not satisfied his burden establishing the existence of federal jurisdiction, the court will allow Complient's motion to remand.[27]

### J. *Plaintiff's Second Motion for Declaratory Judgment (Dkt. No. 151).*

Plaintiff seeks a declaration from this court that he is the sole owner of copyright registration numbers Txu–213–859, Txu–

---

27. Plaintiff's primary purpose in seeking to remove the Hampden County collection case to this court seems to be to avoid "a duplicate assessment of damages." As the court has already noted in ruling on Complient's motion for a default judgment on its counterclaims, the law does not permit double recov-

eries. If Plaintiff's appeal of *Complient II* is unsuccessful and Complient prevails in the Hampden County collection action, Complient will not be entitled to monetary relief in conjunction with its counterclaims in this case.

210–208, the '800 patent, the '685 patent, and the registered trademark "CPR Prompt®." According to Plaintiff, such a declaration is needed to resolve the current "confusion in the marketplace" concerning the ownership and control of these intellectual properties.

While Plaintiff states that over fifty distributors are presently marketing CPR Prompt® units, he has not identified any of these alleged infringers. Because the court is unwilling to render a declaratory judgment affecting parties who have not had a chance to contest Plaintiff's allegations, this motion will be denied.

**K. Plaintiff's Motion to Join CPR L.P. (Dkt. No. 154).**

Plaintiff argues that CPR L.P.'s status as a party to the APA makes its presence in this action necessary and indispensable. Generally speaking, "a party to a contract which is the subject of the litigation is considered a 'necessary' party." *Blacksmith Investments, LLC v. Cives Steel Co., Inc.*, 228 F.R.D. 66, 74 (D.Mass.2005) (citation omitted). However, the First Circuit has made it clear that one aim of Rule 19 is to prevent "the single lawsuit from becoming fruitlessly complex or *unending*." *Pujol*, 877 F.2d at 134 (emphasis added) (citation omitted). In light of Plaintiff's failure to account for the delay in seeking to join CPR L.P., fairness dictates that this motion be denied. *See Serrano Medina v. United States*, 709 F.2d 104, 106 (1st Cir.1983) (affirming district court's conclusion that the allowance of plaintiff's "eleventh-hour" addition of new parties "would result in undue prejudice to the defen-

dants," as it would "require additional research and discovery").[28]

**L. Plaintiff's Motion to Withdraw his Motion to Join Stradling, Yocca, Carlson & Rauth (Dkt. No. 163).**

This motion has not been opposed and will be allowed.

**M. Plaintiff's Motion for Sanctions Against Counsel for Complient (Dkt. No. 165).**

Citing Local Rule 1.3,[29] Plaintiff seeks sanctions against Colleen O'Neil, an attorney for Complient, based on (1) her misrepresentation of *Complient II;* (2) her decision to make CPR Prompt a co-defendant in *Complient II;* and (3) her decision to seek (and obtain) summary judgment against Plaintiff in *Complient II* on the ground of *res judicata.*

In support of his first accusation, Plaintiff claims that Attorney O'Neil has attempted to use *Complient II* for the purposes of *res judicata* in the case at bar despite a finding by the Cuyahoga County Court of Appeals that the record did not permit such a use. Plaintiff has not attached a copy of the purportedly favorable decision to his motion.

Other filings by Plaintiff indicate that the Supreme Court of Ohio is currently reviewing a decision by an intermediate court of Ohio concerning *Complient II.* (*See* Dkt. No. 188, Ex. B., Ohio Sup.Ct. Case Information Re: *Complient v. Hutchins*, GEN–2006–0741 (citing a Cuyahoga County, 8th District decision dated March 16, 2006).). However, Plaintiff's

---

**28.** It also bears noting that CPR L.P.'s interests appear identical to those of Complient and that CPR L.P. has disclaimed an interest in this action. *See Tell v. Trs. of Dartmouth Coll.*, 145 F.3d 417, 419 (1st Cir.1998).

**29.** This provision provides that a "[f]ailure to comply with any of the directions or obligations set forth in, or authorized by, these Local Rules may result in dismissal, default, or the imposition of other sanctions as deemed appropriate by the judicial officer." Local Rule 1.3.

status as the "appellant" before the Ohio Supreme Court strongly suggests that the Cuyahoga County Court of Appeals did not find in Plaintiff's favor.[30]

■ As for Attorney O'Neil's alleged misconduct in litigating the *Complient II* action, Complient is correct in noting that this court lacks jurisdiction to impose sanctions for supposed misrepresentations made before another tribunal. Thus Plaintiff's motion must be denied.

### N. *Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 170).*

This motion will be denied for the reasons set forth in Section III.A.3.

### O. *Plaintiff's Motion to Join Axentis (Dkt. No. 175).*

In this motion, Plaintiff seeks to join an entity "spun off" by Complient in January 2003, an action which Plaintiff alleges should have triggered the 7.5% payment provision found in § 3.10 of the License Agreement. This motion is untimely and will be denied for the reasons set forth in Section IV.K.[31]

### P. *Plaintiff's Motion to Define Complient (Dkt. No. 187).*

Plaintiff seeks an order from this court "defining" Complient as the corporation itself, as well as persons and entities related to it, including Jon Lindseth, Steven Lindseth, CPR L.P., and Axentis. In support of this request, Plaintiff cites documentation, recently disclosed in the Cuyahoga County proceeding, which shows that Complient has paid all the legal fees for the above persons and entities over the course of this protracted litigation.

■ This motion will be denied. "The doctrine of corporate disregard is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is *necessary to provide a meaningful remedy for injuries* and to avoid injustice." *Attorney Gen. v. M.C.K., Inc.*, 432 Mass. 546, 736 N.E.2d 373, 380 (2000) (emphasis added) (citation omitted); *accord Yo–Can, Inc. v. Yogurt Exch.*, 149 Ohio App.3d 513, 778 N.E.2d 80, 90 (2002) ("Successfully piercing the corporate veil places personal liability on individual shareholders *for the corporation's liabilities.*" (emphasis added)). Consequently, to invoke the doctrine, "a plaintiff must first establish an independent basis to hold the corporation liable." *In re Casini*, 307 B.R. 800, 811 (Bkrtcy. D.N.J.2004) (citing *Peacock v. Thomas*, 516 U.S. 349, 354, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996); *Trs. of the Nat'l Elevator Indus. Pension v. Andrew Lutyk*, 332 F.3d 188, 192 (3rd Cir.2003)); *see also Novomoskovsk Joint Stock Co. "Azot" v. Revson*, No. 95 Civ. 5399 JSR, 1998 WL 651076, at *6 (S.D.N.Y.1998).

Because Plaintiff has not established an independent basis to hold Complient liable, the court need not consider whether the relationship between Complient and the

---

**30.** Plaintiff has also argued that his pending appeal of *Complient II* prevents it from operating as *res judicata.* While the pendency of an appeal prevents a judgment from operating as *res judicata* in some jurisdictions, "the law of Ohio is well settled ... that the pendency of an appeal does not preclude the application of collateral estoppel." *N.Y. Life Ins. Co. v. Tomchik*, No. 98–CO–38 & 98–CO–71, 1999 WL 159227, at *2–3 (Ohio App. 7 Dist. Mar.17, 1999); *see also Cully v. Lutheran Med. Ctr.*, 37 Ohio App.3d 64, 523 N.E.2d 531, 532 (1987) (per curiam); *but see Uebel v. Bd. of Ed. of Edgewood City Sch. Dist.*, No. CA2001–05–104, 2002 WL 336931, at *2 (Ohio App. 12 Dist. Mar.4, 2002).

**31.** Like CPR L.P., Axentis has disclaimed an interest in this action.

above entities or persons renders them one and the same.

Q. *Complient's Motion to Strike Plaintiff's Second Amended Complaint (Dkt. No. 198).*

On August 2, 2006, Plaintiff filed a second amended complaint, adding a claim for conspiracy against non-parties to this litigation and deleting allegations of copyright infringement, fraudulent misappropriation and sale of patent, and tortious interference with contract.

The Federal Rules of Civil Procedure provide that a party seeking to amend his complaint after a responsive pleading is served may only do so "by leave of court or by written consent of the adverse party." Fed.R.Civ.P. 15(a). In this case, Plaintiff has neither attempted to obtain Complient's consent nor filed a motion to amend. Consequently, the motion to strike will be allowed, and the court will disregard Plaintiff's purported second amended complaint.

## V. *CONCLUSION*

For the reasons stated above, the court hereby: ALLOWS Complient's Motion for Summary Judgment (Dkt. No. 66); DENIES Complient's Motion for Default Judgment (Dkt. No. 67); DENIES Plaintiff's Motion for Summary Judgment (Dkt. No. 87); DENIES Plaintiff's Motion for Declaratory Judgment (Dkt. No. 105); DENIES, as moot, Plaintiff's Motion to Enjoin Cardiac Science to disclose the identity of the current licensee (Dkt. No. 120); DENIES, as moot, Plaintiff's Motion to Join Stradling, Yocca, Carlson & Rauth (Dkt. No. 127); DENIES Plaintiff's Motion to Join Steven Lindseth (Dkt. No. 129); DENIES Plaintiff's Motion for Removal (Dkt. No. 134); DENIES Plaintiff's Motion to Schedule a Jury Trial (Dkt. No. 139); DENIES Plaintiff's Motion to Strike (Dkt. No. 141); ALLOWS Complient's Motion to Remand (Dkt. No. 149); DENIES Plaintiff's Second Motion for Declaratory Judgment (Dkt. No. 151); DENIES Plaintiff's Motion to Join CPR L.P. (Dkt. No. 154); ALLOWS Plaintiff's Motion to Withdraw his Motion to Join Stradling, Yocca, Carlson & Rauth (Dkt. No. 163); DENIES Plaintiff's Motion for Sanctions Against Counsel for Complient (Dkt. No. 165); DENIES Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 170); DENIES Plaintiff's Motion to Join Axentis (Dkt. No. 175); DENIES Plaintiff's Motion to Define Complient (Dkt. No. 187); and ALLOWS Complient's Motion to Strike the Second Amended Complaint (Dkt. No. 198).

In light of these rulings, four items remain: (1) Plaintiff's motion for relief from the court's September 28, 2005 order denying Plaintiff's motion for a temporary restraining order (Dkt. No. 107); (2) Plaintiff's motion for relief from the court's June 23, 2005 order allowing Cardiac Science's motion for summary judgment (Dkt. No. 108); (3) Plaintiff's motion for sanctions against counsel for Cardiac Science (Dkt. No. 191); and (4) Complient's counterclaims. As previously noted, the court will address the first three items in a forthcoming memorandum and order. The court hereby orders Complient to file a status report no later than October 16, 2006, indicating whether it will continue to pursue relief on its counterclaims, notwithstanding the results of the *Complient II* litigation.

It is So Ordered.